**UNITED STATES of America,**

v.

**George E. KLINE and Erich Kline et al.**

**No. 01–CR–69 JMR/FLN.**

United States District Court, D. Minnesota.

April 4, 2002.

Douglas A. Kelley, Kelley Law Office, Mpls, MN, for George E. Kline.

William Joseph Mauzy, Mauzy Law Office, Mpls, MN, for Robert R. Hibbs.

Joseph Stuart Friedberg, Friedberg Law Office, Mpls, MN, for Erich A. kline.

Kevin J. Short, Short Law Office, Mpls, MN, for Christian T. Kline and Protective Mouthguards Inc.

Charles Lee Hawkins, Hawkins Law Office, Mpls, MN, for Bruce D Le Duc.

Robert Taras Rudy, Hennepin Cty Attorney, Mpls, MN, for County of Hennepin.

Bruce L. Anderson, Lake County Atty, Two Harbors, MN, for County of Lake.

Wallace Goodell Hilke, Michael Orville Freeman, Terrence Joseph Fleming, Lindquist & Vennum, Mpls, MN, for Rimage Corporation.

James Edward Ramette, Fuller Seaver & Ramette, Chanhassen, MN, pro se.

## ORDER

ROSENBAUM, Chief Judge.

This case had been set for sentencing on March 20, 2002. The Court has delayed the sentencing hearing in order to resolve claims for restitution made by an individual and corporate entities who claim to have been victims of the defendants' criminal acts.

Prior to the formal restitution hearing, the Court heard from Douglas A. Kelley and Joseph S. Friedberg, counsel for defendants George E. Kline and Erich Kline, respectively. Mr. Kelley acknowledged on behalf of his client that virtually all of the events about which the Court would hear had actually occurred. He also acknowledged George Kline's responsibility for those acts, in accord with Mr. Kline's plea agreement. Mr. Kelly, however, asked the Court to consider whether his client's acts were material to any losses actually sustained by those claiming to be victims, and whether his client's acts made him liable for any restitution. Mr. Friedberg made a similar argument on behalf of Erich Kline.

The Court, thereafter, conducted an evidentiary hearing. The hearing was occasioned by the nature of George and Erich Kline's plea agreements, under which each agreed to pay a pre-agreed sum for a criminal fine. It was further agreed that the United States would not seek any additional sum.[1] Beyond this, however, each defendant's plea agreement provided that the Court could make any restitutionary decision it deemed appropriate, as provided by law. [Plea Agmt. ¶ 12.]

At the restitution hearing, the Court heard claims made by Ms. Melinda Begnaud and three corporate entities—Rimage Corporation, CyperOptics Corporation, and Stockwalk Group, Inc. The Court finds Ms. Begnaud is to be awarded the sum of $259,010.25, over and above the fine which defendants George and Erich Kline have agreed to pay. The corporate claimants are denied any award of restitution as part of this criminal proceeding.

Based on the evidence adduced at the hearing, the submissions of the parties, and the files and records herein, the Court makes the following findings of fact:

### A. *Claim of Ms. Melinda Begnaud*

Melinda Begnaud held shares in NM Holdings Company in the early months of

---

1. Under the plea agreements, George Kline agreed to forfeit approximately $5 million worth of assets and a fine of $250,000; Erich Kline agreed to forfeit assets worth approximately $200,000, and a fine of $250,000. The defendants' agreements went further: If the Court declined to impose dollar-sanctions as large as a particular defendant had agreed to pay, the Securities and Exchange Commission would seek to collect the difference between the fine imposed and the amount the Court found appropriate, up to the preagreed sum.

1999. She was then, and is today, unsophisticated in securities matters.

Ms. Begnaud had been married to William Rush. Mr. Rush had been was no longer involved in the company or its management. Ms. Begnaud was divorced from William Rush in late-January, 1999. As part of the divorce settlement, Ms. Begnaud received 92,500 shares of NM Holdings stock, representing approximately one-half the shares the couple owned in the business.

NM Holdings ceased active business during the summer of 1998 after selling its assets. This left it, in 1999, a corporate shell holding a substantial amount of cash. Its shares continued to be publicly traded, if only on a limited basis. According to Mr. Rush, in early 1999, it was typical that only a very few thousand shares of NM stock traded each day.

In March, 1999, shortly after the divorce, Ms. Begnaud contacted her husband and asked him to help sell her NM Holdings stock. Mr. Rush said it might be difficult to sell such a large block of NM shares, but if it were possible to do so, he might consider selling half of his own shares if she would consider selling only half of hers. Ms. Begnaud agreed. Mr. Rush told her he would contact George Kline to discuss the possibility of selling the shares. He knew that George Kline had been a shareholder and involved in NM Holdings when it was actively engaged in business.

Ms. Begnaud stated she believed her former husband called Mr. Kline for advice about the transaction. Mr. Rush denied seeking "advice" from George Kline. He testified, instead, that he simply asked George Kline if he knew of a purchaser for

such a large block of NM shares. Regardless of whether Mr. Rush sought advice or merely inquired to find a purchaser for nearly 100,000 shares of NM stock, George Kline said he would check into it and call Mr. Rush back.

George Kline returned Mr. Rush's call a short time later, as promised. George Kline told Mr. Rush there was a buyer for the stock who was willing to pay approximately $1.70 per share, an amount very close to the market price. George Kline also told Mr. Rush the transaction would be taken care of by his son, Erich Kline. Erich Kline was a stockbroker at the Dougherty & Company securities firm. Neither Ms. Begnaud nor Mr. Rush had previously purchased or sold any stock through Erich Kline.

Having received this information, Mr. Rush called Ms. Begnaud and told her two things: first, he said there was a buyer for the stock; second, he said that since there was a buyer for a nearly 100,000 share block, he had decided he would not sell his own shares, and she could proceed to sell all of hers. At the restitution hearing, he stated that, after he had been told there was a buyer for this large block of NM stock, he decided "to roll the dice" regarding the sale of his own NM Holdings shares. As a result, he held them until a time much closer to the NM Holdings merger transaction.

George Kline never told either Ms. Begnaud or Mr. Rush that he was privy to insider information concerning a merger offer about to be made, and presented, to NM Holdings. According to the Indictment, to which (among others) George Kline and Erich Kline have pleaded guilty, each repeatedly engaged in insider trading involving the NM merger between December, 1998, and July 6, 1999.[2] During the

2. The Indictment alleges that George Kline engaged in merger discussions held between Miller, Johnson, and Kuehn and NM Holdings between February 5, 1999, and March 2,

1999. The Indictment alleges that George Kline, with the assistance of Erich Kline and Christian Kline, arranged for, and caused the private sale of, 90,000 shares of NM Holdings

period of their insider trading, the shares of NM Holdings increased in price until, at one time, they commanded in excess of $15.00 per share.

When Ms. Begnaud learned her 92,500 shares could be sold, she told her husband to contact Erich Kline. Erich Kline provided Ms. Begnaud with the forms necessary to complete the transaction. After filling out the forms, Erich sold the shares. A check in the amount of $157,239.75 was delivered to Ms. Begnaud.

Very shortly after Ms. Begnaud sold her shares for $1.70 per share, NM Holdings' share price climbed to $4.50 per share, and higher. According to the Indictment, George Kline, Erich Kline, Christian Kline, and co-defendant Robert Hibbs sold 107,-000 shares of NM Corporation stock, thereby realizing over $750,000 in an insider trading profit.

Based upon his plea in the underlying criminal case, the Court finds—to a degree of certainty far beyond a preponderance of the evidence—that George Kline, whose insider trading in NM Holdings stock began in December, 1998, knew or had reason to believe there was an impending merger which would positively impact the price of NM Holdings stock when he learned Ms. Begnaud's shares might be available. Further, the Court finds it highly probable that George Kline knew Erich Kline, his son, would handle the sale transaction in a fashion which assured that Ms. Begnaud's shares would be purchased by George Kline's wholly-owned stock holding company, Protective Mouthguards, Inc. ("PMI"), Robert Hibbs, Erich and Christian Kline, and the remainder to select clients of Erich Kline.

The Court further finds—to the same high degree of certainty, based upon his plea to the underlying Indictment—that Erich Kline was complicitous in the sale stock from an uninformed seller. *See* Indict-

and placement of Ms. Begnaud's shares. Erich Kline's guilty plea testimony indicated his understanding that when his father gave him instructions or told him to engage in certain transactions, his father possessed information which was not available to the public. In Ms. Begnaud's case, Erich Kline was given the responsibility of disposing of a large block of NM shares from a person with whom he had never dealt, in a transaction arranged by his father, George Kline. This huge block of stock—in a thinly-traded company—was privately placed in a transaction which was at or very near the recent market price. Erich Kline knew this was part of an insider trading transaction.

Based upon the forgoing facts, the Court makes the following Conclusions of Law:

Melinda Begnaud suffered an insider trading loss at the hands of George and Erich Kline in the sale of her shares of NM Holdings stock.

### B. *Materiality*

Notwithstanding these Conclusions of Fact and Law, both George and Erich Kline, through their respective counsel, deny that their insider trading was material to Ms. Begnaud's stock sale, or to any sum she realized from the sale. They are wrong. Their argument is disingenuous; Ms. Begnaud is entitled to restitution from both George and Erich Kline.

The materiality argument goes as follows: Ms. Begnaud had a block of shares to sell. The stock was trading on the open market at or near $1.70 a share at the time. She sold it at the market price, and realized the shares' worth. Therefore, according to the argument, she has sustained no loss, and any advance knowledge which was possessed by either of the Klines is immaterial. Based on this theory, the ment, ¶¶ 71–77.

Klines contend Ms. Begnaud is not entitled to restitution.

There is an unstated subchord to their argument: It posits that the sale of such a large block of stock, in this thinly-traded company would, in fact, likely depress the market by flooding it with NM Holding shares. When these shares hit the market, they would likely lower the share prices. The subchord, ultimately suggests Ms. Begnaud may have benefitted from the Klines' and their confederates' smooth accession of the shares at the market price. The argument is fallacious, and the Court rejects it.[3]

The reason the Klines' argument is fallacious is, of course, because Ms. Begnaud was not engaged in a transaction with an honest broker. She had stumbled into an ongoing securities fraud, based on insider trading. While she assumed she had engaged in a fair game, she was actually playing against a fixed-deck. She was deprived of her right to either fairly win or fairly lose in her stock sale. In this regard, she was a victim of an insider trading fraud, and has suffered damage for which restitution is appropriate.

In an honestly conducted market, a share's price is more than a dollar-statement; it is also a source of information. And this "information" was involved in this case: When George Klein told Mr. Rush there was a market-price buyer for this very large block of NM stock, Rush "decided to roll the dice," as he candidly told the Court.

What did he mean? The Court concludes he realized that it would be unusual, in the extreme, that there would be a buyer who would accept such a large block of this thinly-traded stock, without any consideration of the possibility the share price might fall if it were released into the open market. The clear implication to a sophisticated stock-trader—which Ms. Begnaud was not—would be that something was ahead in the market which was influencing the purchaser's decision. Mr. Rush read the signal; Ms. Begnaud could not read it. Finally, if the trade had been fair and honest, when Ms. Begnaud heard of the likely lowered price (as opposed to the higher price supported by the criminal insiders), she could conceivably have opted to hold on to her shares for a longer period of time.

Ms. Begnaud is a victim of both George and Erich Kline's criminal machinations. Their criminal acts were material to her sale of her NM stock. Each defendant personally profited from illegally using George Kline's insider information, thereby taking unfair advantage of Ms. Begnaud, an uninformed market participant. Federal securities laws are designed to prevent just this sort of conduct. As a result of their material criminal acts, each defendant participated in depriving her of the price to which she should have been fairly entitled.

The Court takes judicial notice of the fact that NM Holdings' share price rose far beyond $4.50 in the ensuing weeks. Having considered all of these facts, and based upon its prior conclusions, the Court finds it proper to award restitution to Ms. Begnaud as though her shares were sold at $4.50 per share.

She has already received $157,239.75 from the actual sale; therefore, she is

---

**3.** The Court does, however, acknowledge that, had Ms. Begnaud gone to another—and honest, non-insider stockbroker—she might well have gotten a smaller sum for her shares. And if she had done so, she would have no claim at all. This is because, if she had engaged in a brokerage transaction with an honest broker, she is entitled to make or lose money in any stock transaction. Her loss or gain would have been of no concern to the law.

entitled to a restitutionary sum of $259,010.25. This includes the amount she was previously charged for Erich Kline's brokerage fee. The Court finds, under its agreed authority set forth in the plea agreement, that this sum is in addition to the sums each defendant has agreed to pay in their respective plea agreements.

Finally, the Court thinks it proper to summarize the defendants' conduct. The Court, however, cannot find a better summary than that given by Ms. Begnaud at the restitution hearing. She said, speaking of George Kline, "I went to him. And he did have information, and I believe it was used, not for me. It was used for someone else." No more needs to be said.

B. *The Corporations' Claims*

■ Rimage Corporation, Stockwalk, and CyperOptics Corporation each claim they have been harmed by George Kline's criminal conduct in the course of "a scheme, conspiracy, or pattern of criminal activity." 19 U.S.C. § 3663A(a)(2). Each asks the Court to award them the profits which Kline amassed during his illegal short-swing trading, pursuant to Section 10b–5 and Section 16b of the '34 Securities Act, and the Mandatory Victim's Restitution Act ("MVRA"). 18 U.S.C. § 3663A. The government, while acknowledging the potential claims these entities might possess, asserts that the corporations, as opposed to individuals, are limited to a civil remedy, pursuant to Section 16(b) of the 1934 Securities Act. According to the government, because the Section 16(b) remedy entails strict liability, it cannot be imposed as a criminal remedy, regardless of whether the government can or cannot prove criminal intent. The corporations argue that the government has filed forfeiture actions against most all of the defendants' assets, thereby leaving little or no assets or capacity with which to pay any civil judgment. Each argues argue they should be entitled to restitution before the gov-

ernment collects any potential fines as part of this criminal procedure. The government replies that if the Klines are without assets, the corporations, after winning a civil judgment, may petition the U.S. Attorney General, Asset Forfeiture Office, for remission.

The Court, instead of resolving this argument, declines to order restitution to the corporations in this criminal matter, pursuant to 18 U.S.C. § 3663(a)(1)(B)(ii) & 3663A(c)(3)(B) (stating to "the extent that the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the court may decline to make such an order.") The Court, while recognizing each corporation's concern, does not intend to assume the role of a collection agency in this criminal case. Doing so would open the matter to further collateral claims by other corporations. It may also open up extensive examination of corporate governance and issues far beyond the scope of this prosecution. It would unnecessarily prolong and complicate the sentencing process. The corporations' better remedy is a pursuit of any rights they possess in a private lawsuit.

Therefore, based on the files, records, and proceedings herein, IT IS ORDERED THAT:

1. Defendants George and Erich Kline shall pay restitution to Melinda Begnaud in the amount of $259,010.25. This amount is owed jointly and severally.

2. Rimage Corporation's motion for an award of restitution is denied. [Docket # 114].

3. Stockwalk's request for restitution is denied.

4. CyberOptics' request for restitution is denied.